02-11-060-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00060-CV

 

 


 
 
 Amos McAlister a/k/a A.L. McAlister, Individually
 and d/b/a Albam Investments and Barbara McAlister, Individually and d/b/a
 Albam Investments
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Hatbreeze Properties, L.L.C.
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE 141st
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellants
Amos McAlister and Barbara McAlister (together, the McAlisters), individually
and doing business as Albam Investments, appeal the trial court’s judgment
awarding appellee Hatbreeze Properties, L.L.C. damages for the McAlisters’
breach of their commercial lease.  We will modify the trial court’s judgment
and affirm it as modified.

Background
Facts

          In
April 2008, the McAlisters entered into a five-year commercial lease agreement
with Hatbreeze for an industrial property.  The monthly rent under the lease
was $3,500.[2]  The McAlisters paid the
rent until January 2009.[3]  In a letter dated March
3, 2009, the McAlisters stated that they learned that Hatbreeze’s insurance
company was cancelling “the insurance on the building” and that they were
concerned “as to whether [their] liability and worker’s comp would be valid if
there [were] no insurance on the building.”  The letter concluded, “Therefore,
to alleviate this situation, I am moving the cabinet shop from this premises. 
I will be vacating your building asap.”

          In
January 2010, Hatbreeze sent a formal demand letter to the McAlisters
requesting $192,000, exclusive of attorneys’ fees and other expenses.  The
letter stated, “Pursuant to Section 11.02 D of the Lease, [Hatbreeze] has
hereby opted to accelerate the unpaid rent for the full term of the Lease. . .
.  The lease also entitles [Hatbreeze] to collect 5% interest on this amount as
a Late Charge.”  The McAlisters did not respond.  In February 2010, Hatbreeze
sued the McAlisters for breach of contract and sought damages “consistent with
the terms of the Lease providing for acceleration, interest[,] and a security
lien.”  Hatbreeze alleged that its damages were $178,500 in unpaid rent plus
$8,925 in interest, attorneys’ fees, and court costs.

          The
McAlisters answered and asserted that Hatbreeze had breached the lease by
failing to renew the insurance on the property in January 2009 and that
Hatbreeze had failed to mitigate its damages.  The McAlisters also filed
counterclaims for breach of contract, fraud, and fraudulent inducement.  Hatbreeze
filed a traditional and no-evidence motion for summary judgment on its claim
against the McAlisters and on the McAlisters’ counterclaims.  No order on the
summary judgment motion appears in the record, but the final judgment provides
that the trial court granted the motion in September 2010 as to Hatbreeze’s
claim and as to the McAlisters’ counterclaims, defenses, and affirmative
defenses.

Hatbreeze
relet the property in October 2010 for $3,400 per month, which is $100 per
month less than the McAlisters’ rent under their lease.  Hatbreeze filed a
supplemental petition noting the new tenant and lease terms, and praying for
damages in pursuit of reletting the property.  A trial to the bench was held on
the matter of damages, and the trial court awarded Hatbreeze damages of
$95,332.68, attorneys’ fees, court costs, and prejudgment interest.  This
appeal followed.

Discussion

We
address the McAlisters’ fourth through ninth issues first, as those challenge
the summary judgment, are potentially dispositive, and afford the greatest
relief.  See Tex. R. App. P. 47.1; see generally VanDevender v. Woods,
222 S.W.3d 430, 433 n.9 (Tex. 2007); West v. Robinson, 180 S.W.3d 575,
576–77 (Tex. 2005).

I.  Summary
judgment

Hatbreeze
moved for traditional summary judgment on its breach of contract claim.  It
moved for no-evidence summary judgment on the McAlisters’ defenses of failure
to mitigate and discharge and on their counterclaim for breach of contract.[4]  Hatbreeze moved
for summary judgment on the McAlisters’ counterclaims of fraud and fraudulent
inducement on both traditional and no-evidence grounds.

We
review a summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  After an adequate time for discovery, the party
without the burden of proof may, without presenting evidence, move for summary
judgment on the ground that there is no evidence
to support an essential element of the nonmovant’s claim or defense.  Tex. R.
Civ. P. 166a(i).  The motion must specifically state the elements for which
there is no evidence.  Id.; Timpte
Indus., Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court
must grant the motion unless the nonmovant produces summary judgment evidence
that raises a genuine issue of material fact.  See Tex. R. Civ. P.
166a(i) & cmt.; Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008). 
We consider the evidence presented in the light most favorable to the
nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors
could, and disregarding evidence contrary to the nonmovant unless reasonable
jurors could not.  Mann Frankfort Stein & Lipp Advisors, Inc. v.
Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable
inference and resolve any doubts in the nonmovant’s favor.  20801, Inc. v.
Parker, 249 S.W.3d 392, 399 (Tex. 2008).  A plaintiff is entitled to
summary judgment on a cause of action if it conclusively proves all essential
elements of the claim.  See Tex. R. Civ. P. 166a(a), (c); MMP, Ltd.
v. Jones, 710 S.W.2d 59, 60 (Tex. 1986).  A plaintiff who conclusively
negates at least one essential element of a cross-claim is entitled to summary
judgment on that claim.  Frost Nat’l Bank v. Fernandez, 315 S.W.3d 494,
508 (Tex. 2010); see Tex. R. Civ. P. 166a(b), (c).

When
reviewing a no-evidence summary judgment,
we examine the entire record in the light most favorable to the nonmovant,
indulging every reasonable inference and resolving any doubts against the
motion.  Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006).  We review a no-evidence summary judgment for evidence that
would enable reasonable and fair-minded jurors to differ in their conclusions.  Hamilton,
249 S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).  We credit evidence favorable to the nonmovant if reasonable
jurors could, and we disregard evidence contrary to the nonmovant unless reasonable
jurors could not.  Timpte Indus., 286 S.W.3d at 310 (quoting Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006)).  If the nonmovant
brings forward more than a scintilla of probative evidence that raises a
genuine issue of material fact, then a no-evidence
summary judgment is not proper.  Smith v. O’Donnell, 288 S.W.3d 417, 424
(Tex. 2009); King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003), cert. denied, 541 U.S. 1030 (2004).  When a party moves for
summary judgment under both rules 166a(c) and 166a(i), we will first review the
trial court’s judgment under the standards of rule 166a(i).  Ford Motor Co.
v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).  If the appellant failed to
produce more than a scintilla of evidence under that burden, then there is no
need to analyze whether the appellee’s summary judgment proof satisfied the
less stringent rule 166a(c) burden.  Id.

A.  Insurance

The
McAlisters’ fourth, seventh, eighth, and ninth issues involve the question of
whether Hatbreeze was required by the lease to maintain insurance on the
property, and if so, whether Hatbreeze maintained the insurance as required.

          In
their eighth and ninth issues, the McAlisters complain that the trial court
erred in granting traditional summary judgment on Hatbreeze’s claim for breach
of contract because a genuine issue of material fact existed regarding whether
Hatbreeze performed under the lease.  Specifically, the McAlisters challenge
the trial court’s findings that the lease requirement that Hatbreeze have
insurance was immaterial or a mutually dependent term.  In their seventh issue,
the McAlisters challenge the no-evidence summary judgment on their affirmative
defense of discharge, arguing that Hatbreeze’s failure to maintain insurance on
the property discharged their duty to perform under the contract.  In their
fourth issue, the McAlisters challenge the no-evidence summary judgment on
their claim for breach of contract because Hatbreeze failed to maintain insurance
as required by the lease.

          In
order to recover on its breach of contract case, Hatbreeze was required to show
(1) the existence of the lease; (2) its compliance with the terms of the lease;
and (3) the breach of the lease by the McAlisters.  See McGraw v. Brown
Realty Co., 195 S.W.3d 271, 276 (Tex. App.—Dallas 2006, no pet.); Bieganowski
v. El Paso Med. Ctr. Joint Venture, 848 S.W.2d 361, 362 (Tex. App.—El Paso
1993, writ denied).  The McAlisters argued that Hatbreeze did not comply with
the section of the lease that required it to maintain insurance on the
property.  Hatbreeze’s alleged breach of contract, they argued, defeats summary
judgment on Hatbreeze’s breach of contract claim, the McAlisters’ affirmative
defense of discharge, and their counterclaim for breach of contract.

Only
a material breach by a party to an agreement will excuse the performance of the
other contracting party.  See Hernandez v. Gulf Group Lloyds, 875 S.W.2d
691, 692 (Tex. 1994).  In determining the materiality of a breach, courts
consider, among other factors, the extent to which the nonbreaching party is
deprived of the benefit it could have reasonably expected from the other party’s
full performance.  Id. at 693.  The less the nonbreaching party is
deprived of its expected benefit, the less material the breach.  Id.  It
follows that if there is no evidence of an expected benefit to the nonbreaching
party, there is no evidence of the materiality of the breach.  While
materiality of a breach is normally a question of fact, if there is no evidence
to raise a question of fact, the court may grant summary judgment as a matter
of law.  See Tex. R. Civ. P. 166a(c); Frost Nat’l Bank, 315
S.W.3d at 508.

          Section
5.01 of the lease states,

During the Term,
Landlord shall maintain policies of insurance covering loss of or damage to the
Premises in an amount or percentage of replacement value as Landlord deems
reasonable . . . .  The policies will provide protection
against all perils that Landlord reasonably deems necessary.  Landlord may, at
Landlord’s option, obtain insurance coverage for Tenant’s fixtures,
equipment[,] or building improvements installed by Tenant in or on the
Premises.  Tenant shall, at Tenant’s expense, maintain insurance on Tenant’s
fixtures, equipment[,] and building improvements as Tenant deems necessary to
protect Tenant’s interest. . . .  Any property insurance carried by Landlord or
Tenant shall be for the sole benefit of the party carrying the insurance and
under its sole control.

The
lease’s plain language states that any insurance on the property carried by
Hatbreeze was for the sole benefit of Hatbreeze, not the McAlisters.  The
McAlisters argue that they provided evidence that Hatbreeze told them that its
insurance had lapsed and thus, the McAlisters argue, they have demonstrated
that a genuine issue exists as to whether Hatbreeze violated terms of the
lease.  However, the McAlisters have not provided any evidence of a benefit
they would have received by Hatbreeze maintaining property insurance for its “sole
benefit.”  Without a benefit to the McAlisters, any breach by Hatbreeze of the
insurance provisions cannot be deemed material.

There
is no evidence that Hatbreeze was required to maintain insurance for the
McAlisters’ benefit.  Thus, there is no evidence that Hatbreeze failed to
perform under the contract so as to discharge the McAlisters from paying rent. 
Summary judgment was therefore proper on the McAlisters’ discharge defense and
their counterclaim for breach of contract.  Hatbreeze demonstrated that it did
not materially breach the lease by failing to provide insurance on the property
so summary judgment was also proper on Hatbreeze’s claim for breach of contract
because there is no genuine issue as to whether Hatbreeze performed under the
contract, and the McAlisters did not challenge any other element of Hatbreeze’s
cause of action.  We overrule the McAlisters’ fourth, seventh, eighth, and
ninth issues.

B.  Fraud
and fraudulent inducement

In
their fifth and sixth issues, the McAlisters challenge the summary judgment on
their counterclaims for fraud and fraudulent inducement.  Hatbreeze moved for
summary judgment on the McAlisters’ counterclaims of fraud and fraudulent
inducement on both traditional and no-evidence grounds.  Thus, we will review
the trial court’s judgment under the no-evidence standards first to determine
if the McAlisters produced a scintilla of evidence to support their claims.  See
Ford Motor Co., 135 S.W.3d at 600.

          The
elements of fraud are:  (1) that a material representation was made; (2) the
representation was false; (3) when the representation was made, the speaker
knew it was false or made it recklessly without any knowledge of the truth and
as a positive assertion; (4) the speaker made the representation with the
intent that the other party should act upon it; (5) the party acted in reliance
on the representation; and (6) the party thereby suffered injury.  Italian
Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 337
(Tex. 2011).  With a fraudulent inducement claim, the elements of fraud must be
established as they relate to an agreement between the parties.  Haase v.
Glazner, 62 S.W.3d 795, 798–99 (Tex. 2001).

          In
their petition, the only injury that the McAlisters claimed as a result of
Hatbreeze’s alleged common law fraud was the cost of moving the business from
the property, a cost of $106,114.  However, the McAlisters have repeatedly
asserted that the reason they vacated the premises was their belief that
Hatbreeze’s insurance had been cancelled.  As Amos McAlister stated in his
affidavit,

I
vacated the building based upon the representations by Hatbreeze regarding the
insurance.  This reliance was made clear in my letter dated March 3, 2009,
which was never responded to.  Had they informed me that the insurance was
still on the property, I would have continued to work with them to remedy the
other defects on the property rather than vacating.

But
the McAlisters’ claim for fraud, as alleged in their live petition, is based on
alleged misrepresentations concerning the age and structural condition of the
roof, not misrepresentations about insurance.  The summary judgment evidence
that the McAlisters direct us to in support of the assertion of error deal only
with the issue of the roof.  Amos McAlister’s own affidavit defeats their argument. 
The undisputed evidence shows that the McAlisters did not vacate the building
due to misrepresentations concerning the roof but instead because Hatbreeze
purportedly let the insurance lapse.  There is no evidence that the sole injury
of which the McAlisters complain was caused by misrepresentations regarding the
roof.  The McAlisters have not presented any evidence of injury associated with
the alleged fraud.  Thus, the trial court did not err in granting summary
judgment on their fraud claim.

As
to their fraudulent inducement claim, the McAlisters argue that Hatbreeze made
two fraudulent statements:  one, that the building had a new roof; and two,
that the building had only been used for storage.  However, the only damages
that the McAlisters allege were that materials stored in the building were
damaged “[d]ue to the leaking.”  The McAlisters alleged no injury resulting
from the alleged fraudulent statement that the building had only been used for
storage, nor did they present any evidence that the building’s use for purposes
other than storage caused them injury.  Thus, there is no evidence as to
damages caused by the second alleged fraudulent statement and the trial court
did not err in granting summary judgment on that claim.

As
to the first alleged fraudulent statement—that the building had a new roof—the only
evidence the McAlisters presented as to the falsity of the statement was
evidence that the roof leaked.  The building on the property consisted of two
parts:  a concrete industrial office building and a steel structure with a
loading dock.  The evidence showed that the main building had been reroofed in
2007 and that the steel structure “had been overlaid with a clear roofing
material at the same time the new roof was put on the concrete building in
2007.”  However, an “after[-]installed air conditioning unit with tubing [was] installed
into the surface of the roof.  This tubing was not installed correctly and
caused a minor leak in the Building.”  Also, the steel structure “was
structurally unsound.  Any time the wind would blow, the building would shift
and the sealants would crack, resulting in leaks.”

Thus,
the evidence was either that a poorly installed air conditioning unit or a poor
reroofing job caused the leaking in the main building, not that it was not
actually reroofed.  The evidence also showed that it was either a poor
reroofing job on the steel structure or its state of deterioration that led to
the leaking in the steel building, not that it was not reroofed.  And although
Amos McAlister states in his affidavit that he had been assured that the steel
structure was “watertight,” he did not plead that the statements regarding the
watertightness of the building were fraudulent.  In short, the McAlisters did
not plead what they had evidence of, and they did not provide evidence on what
they pleaded.  Thus, the trial court did not err in granting summary judgment
on their claim for fraudulent inducement.

We
overrule the McAlister’s fifth issue.  Because we overrule their fifth issue,
we do not reach their sixth issue regarding the validity of the fraudulent
inducement waiver.  See Tex. R. App. P. 47.1.

II.  Damages
and attorney’s fees

The
McAlisters’ first through third issues complain of the measure of damages used
by the trial court.  Their tenth through thirteenth issues complain of the
amount of damages and attorney’s fees awarded.  The trial court awarded
Hatbreeze $95,332.68 in actual damages.  The trial court made the following
findings of fact relevant to the damages award:

          8.    As of
the date of the Judgment, Defendants failed to pay twenty months of rent for a
total of $70,000 before Plaintiff was able to lease the Property to another
tenant in October of 2010.  There were thirty (30) months left on the Lease
Agreement in October 2010.

 

          9.    Pursuant
to Section 3.03 of the Lease Agreement, a five percent (5%) late fee may be
imposed upon Defendants for failure to pay rent.  Five percent (5%) of
$70,000.00 is $3,500.00.

 

          10.   Plaintiff
entered into a lease agreement with a new tenant who began paying rent in
October of 2010 at the rate of $3,400.00 per month.  The difference in rent
between Defendants’ Lease Agreement and the new tenant’s lease agreement is
$100.00 per month.  The present value of the difference in rent between
Defendants and the new tenant is $2,922.50.

 

          11.   Pursuant
to 11.02 of the Lease Agreement, Plaintiff was entitled to declare rent and
other items due under the Lease Agreement once Defendants breached the Lease
Agreement.  Also therein, Plaintiff could relet the premises in which case
Defendants would be liable for any deficiency that may arise by reason of any
such reletting including professional service fees, reasonable attorneys[‘]
fees, court costs, remodeling expenses[,] and other costs of reletting.

 

          12.   Pursuant
to Section 7.03B of the Lease Agreement, Defendants were responsible for
maintenance and repair of the Property and the HVAC units. . . .

 

          . . . . 

 

          15.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $3,530.00 for electrical bills.

 

          16.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $2,699.53 for the City of Fort
Worth water, trash[,] and sewer.

 

          17.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $3,097.00 for yard cleanup and
other handy man services.

 

          18.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $349.65 for air conditioning
maintenance.

 

          19.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $1,200.00 for remodeling bills.

 

          20.   Between
the period in which Defendants vacated the property and a new tenant was
obligated under a lease, Plaintiff incurred $8,024.00 for realtor commission.

          A. 
The measure of damages

          In
their first issue, the McAlisters argue that the damage provisions of the
contract were unenforceable penalties.  The McAlisters rely on Stewart v.
Basey, 245 S.W.2d 484, 487 (Tex. 1952), for its holding that when a
contract provides the same reparation for the breach of a trivial stipulation
as for the breach of an important one, the damages are not just compensation
and the provision is a penalty.  The McAlisters argue that because their
failure to comply “with any term, condition[,] or covenant” of the lease is
considered a default and could result in the same remedies as would their
failure to pay rent, the remedies provision is an unenforceable penalty.

          We
first note that under the lease’s terms, the stipulation that a failure to
comply “with any term, condition[,] or covenant” of the lease did not rise to a
default until the McAlisters continued that failure “for a period of thirty (30)
days after Landlord deliver[ed] written notice of the failure to Tenant.”[5] 
Thus, the McAlisters could not have defaulted by simply failing to maintain the
yard or HVAC system, but only if they persisted in violating the contract for the
stated period after receiving written notice of their violation.

          Second,
the McAlisters did not bring forth evidence that the stipulated damages were
unreasonable.  See SP Terrace, L.P. v. Meritage Homes of Tex., LLC,
334 S.W.3d 275, 287 (Tex. App.—Houston [1st Dist.] 2010, no pet.); Urban
Television Network Corp. v. Liquidity Solutions, 277 S.W.3d 917, 919 (Tex. App.—Dallas
2009, no pet.) (noting that it is the defendant’s burden to demonstrate the
unreasonableness of a liquidated damages clause).  The trial court awarded
Hatbreeze damages under the contract provision allowing Hatbreeze to relet the
premises and receive the deficiency from the McAlisters.  While the property
was empty, the deficiency was the full amount of rent.  After it was relet, the
deficiency was $100 per month, plus the costs of reletting.  This is the amount
that the trial court awarded Hatbreeze, plus its costs for utilities and
maintenance of the property.  Additionally, the McAlisters stated in their
response to Hatbreeze’s motion for summary judgment on damages that this was
the correct measure of damages.  Because we hold that the trial court was
correct in calculating damages pursuant to the damages provision of the contract,
we overrule the McAlisters’ first issue, and we do not reach their third
issue.  See Tex. R. App. P. 47.1.

          In
their second issue, the McAlisters argue that the trial court erred by finding
that Hatbreeze never used the property for its own purposes.  The McAlisters do
not explain how this finding bears on the damages awarded by the trial court. 
To the extent that the McAlisters argue that Hatbreeze’s use of the property
should reduce the damages they were required to pay, we note that it was the McAlisters’
burden to show the amount of reduction.  See Austin Hill Country
Realty, Inc. v. Palisades Plaza, Inc., 948 S.W.2d 293, 299 (Tex. 1997).  Although
there was evidence that Hatbreeze stored some items in a portion of the
building while it was without a tenant, there was no evidence of what amount
the damages should be reduced because of it.  We overrule the McAlisters’
second issue.

B.  Attorneys’
fees and the amount of damages 

                   1.
 Excessive demand

          In
their twelfth issue, the McAlisters argue that the trial court erred by
granting Hatbreeze attorneys’ fees because Hatbreeze’s initial demand was
excessive.

A
creditor who makes an excessive demand upon a debtor is not entitled to
attorney’s fees for subsequent litigation required to recover the debt.  Findlay
v. Cave, 611 S.W.2d 57, 58 (Tex. 1981).  Application of this rule is
limited to situations where the creditor refuses a tender of the amount
actually due or indicates clearly to the debtor that such a tender would be
refused.  Id.; Hernandez v. Lautensack, 201 S.W.3d 771, 777 (Tex.
App.—Fort Worth 2006, pet. denied).  A demand letter that states that the full
demand amount must be tendered indicates a refusal to accept tender of a lesser
amount.  Aero DFW, LP v. Swanson, No. 02-06-00179-CV, 2007 WL 704911, at
*4 (Tex. App.—Fort Worth Mar. 8, 2007, no pet.) (mem. op.); Warrior
Constructors, Inc. v. Small Bus. Inv. Co. of Houston, 536 S.W.2d 382, 386
(Tex. Civ. App.—Houston [14th Dist.] 1976, no writ).

The initial
demand letter to the McAlisters sought $192,000 in damages, stating,

[T]his letter shall
serve as a demand that you make arrangements to pay the full amount of
$192,000.00 plus attorney’s fees of $2,500.00 for handling this matter within
thirty (30) days of this letter.  In the event you fail to pay the amount, my
client will be forced to file suit against you . . . for breach of contract.

At
the time of the demand, fifty months remained on the McAlisters’ lease. 
Multiplied by their monthly rent of $3,500, the McAlisters would have owed only
$175,000—$17,000 less than Hatbreeze’s demand.  Hatbreeze never offered any
explanation as to the $17,000 difference.

The
McAlisters did not respond to the demand letter.  However, the language
requiring the McAlisters to pay the full $192,000 or else Hatbreeze would file
suit indicates Hatbreeze’s unwillingness to accept the actual amount due.  See
Aero DFW, 2007 WL 704911, at *4; Warrior Constructors, 536 S.W.2d
at 386; Hernandez, 201 S.W.3d at 777.  Thus, the McAlisters were not
required to respond in order to demonstrate Hatbreeze’s refusal to accept
tender of a lesser amount.  Hatbreeze’s demand exceeded the total accelerated
rent and there was no evidence that they were entitled to the extra $17,000. 
Because the demand was excessive and the demand letter indicated a clear intent
to refuse the amount actually due to them, Hatbreeze is not entitled to
attorney’s fees in this case.  See Findlay, 611 S.W.2d at 58; Aero
DFW, 2007 WL 704911, at *4.  We sustain the McAlisters’ twelfth issue.

2.  Utilities and property maintenance costs

In
their eleventh issue, the McAlisters argue that the trial court erred by
allowing Hatbreeze to recover on its claims for utilities and property
maintenance because Hatbreeze did not provide notice as required by the lease. 
Hatbreeze added a demand for utilities and maintenance in its first
supplemental petition.

The
McAlisters rely on section 11.01 of the lease for their assertion that
Hatbreeze was required to deliver written notice to them of their failure to
pay the utilities and maintenance.  Section 11.01 states, in part,

Each of the following
events is an event of default under the Lease:

 

          A.    Failure
of Tenant to pay any installment of the Rent or other sum payable to Landlord
under this Lease on the date that it is due and the continuance of that failure
for a period of five (5) days after Landlord delivers written notice of the
failure to Tenant. . . .

 

          B.    Failure
of Tenant to comply with any term, condition[,] or covenant of this Lease,
other than the payment of Rent or other sum of money, and the continuance of
that failure for a period of thirty (30) days after Landlord delivers written
notice of the failure to Tenant.

 

. . . .

 

          F.    Vacancy
or abandonment by Tenant of any substantial portion of the Premises or
cessation of the use of the Premises for the purpose leased.

Section
11.02 states,

Upon the occurrence
of any of the events of default listed in Section 11.01, Landlord may
pursue any one or more of the following remedies without any prior notice or
demand.

 

          A.    Terminate
this Lease . . . .  Tenant shall pay to Landlord on demand
the amount of all loss and damage that Landlord may suffer by reason of the
termination, whether through inability to relet the Premises on satisfactory
terms or otherwise.

 

          B.    Enter
upon and take possession of the Premises, without terminating this Lease . . . .
 Landlord may relet the Premises and receive the rent therefor.  Tenant agrees
to pay Landlord monthly or on demand from time to time any deficiency that may
arise by reason of any such reletting.  In determining the amount of the
deficiency, the professional services fees, reasonable attorneys’ fees, court
costs, remodeling expenses[,] and other costs of reletting will be subtracted
from the amount of rent received under the reletting.

 

          C.    Enter
upon the Premises, without terminating this Lease and without being liable for
prosecution or for any claim for damages, and do whatever Tenant is obligated
to do under the terms of this Lease.  Tenant agrees to pay Landlord on demand
for expenses that Landlord may incur in thus effecting compliance with Tenant’s
obligations under this Lease, together with interest thereon at the rate of
twelve percent (12%) per annum from the date expended until paid. . . .

 

          D.    Accelerate
and declare the Rent for the entire Term, and all other amounts due under this
Lease, at once due and payable, and proceed by attachment, suit[,] or
otherwise, to collect all amounts in the same manner as if all such amounts due
or to become due during the entire Term were payable in advance by the terms of
this Lease, and neither the enforcement or collection by Landlord of those
amounts nor the payment by Tenant of those amounts will constitute a waiver by
Landlord of any breach, existing or in the future, of any of the terms or
provisions of this Lease by Tenant or a waiver of any rights or remedies that
Landlord may have with respect to any breach.

 

. . . . 

 

          G. Nothing
in this Lease will be construed as imposing any duty upon Landlord to relet the
Premises.  Except as required by applicable law, Landlord will have no duty to
mitigate or minimize Landlord’s damages by virtue of Tenant’s default.  Any
duty imposed by law on Landlord to mitigate damages after a default by Tenant
under this Lease will be satisfied in full if Landlord undertakes to lease the
Premises to another tenant (a “Substitute Tenant”) . . . .

The
McAlisters defaulted on the lease under subsection (A) of section 11.01 by
failing to pay rent and under subsection (F) by vacating the property. 
Hatbreeze did not contend that the McAlisters defaulted under subsection (B). 
Once the McAlisters defaulted, Hatbreeze could pursue, without notice,
any of the remedies listed in section 11.02.  Subsection (C) of that section
includes “do[ing] whatever Tenant is obligated to do under the terms of this
Lease.”  The McAlisters have not challenged the trial court’s findings that
they were responsible under the lease “for maintenance and repair of the
Property and the HVAC units” and “for all utility costs.”  See McGalliard
v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986) (stating that unchallenged
findings of fact “are binding on an appellate court
unless the contrary is established as a matter of law, or if there is no
evidence to support the finding”).  Thus, the contract allowed Hatbreeze to
seek reimbursement for utility and maintenance costs without notice once the
McAlisters defaulted by failing to pay rent and vacating the property.  The
trial court did not err in allowing Hatbreeze to recover those costs and we
overrule the McAlisters’ eleventh issue.

3.  The security deposit

          In
their tenth issue, the McAlisters challenge the trial court’s refusal to credit
their $3,500 security deposit to the amount owed.  At trial, Marcus Johnson, president
of Hatbreeze, testified that the McAlisters had paid a security deposit as
required by the contract.  The contract also allowed Hatbreeze to apply the security
deposit to “any unpaid Rent or other charges due from Tenant or to cure any
other defaults of Tenant.”  See Tex. Prop. Code Ann. § 93.006(a) (West 2007)
(allowing the landlord to deduct from the deposit charges for which the tenant
is liable).  Johnson testified that he had not credited the security deposit to
the amount owed.  Hatbreeze did not provide any evidence that the deposit had
been spent, nor did it provide any reason why the deposit should be forfeited. 
This evidence establishes the McAlisters’ right to a credit in the amount of
the deposit, and the trial court’s failure to credit the deposit is contrary to
the evidence.  See Thrift v. Johnson, 561 S.W.2d 864, 869 (Tex. Civ.
App.—Houston [1st Dist.] 1977) (holding that a lease provision allowing for the
forfeiture of a security deposit as well as the pursuit of a cause of action
for damages was an unenforceable penalty clause).  We sustain the McAlisters’
tenth issue.

                    4.
 Utilities paid by third parties

          In
their thirteenth issue, the McAlisters claim that the trial court erred in
awarding Hatbreeze the utilities that were paid by third parties.  At trial,
Johnson testified that Hatbreeze allowed a band to practice on the property in
October 2009 and that the band mowed the lawn and paid the electricity while
they were there.  He said,

[P]art of our
arrangement with them was that they paid for—while they were there, they paid
for their electricity.

 

          Q.    Has
that amount been reduced out of what you’re seeking today?  

 

          A.    It
should have been.  I mean, I assume so. . . .  If not, it was an oversight of a
couple of hundred dollars.

Dave
Tanner, another principal of Hatbreeze, testified that that the band “paid one
month of the electricity, and I think it was $251.”  No business records or
bills were introduced to show what amount, if any, the band paid.

          The
McAlisters argue, without citation to authority, that it was Hatbreeze’s burden
to prove its damages.  However, it was the McAlisters’ burden to prove the
amount by which Hatbreeze reduced its damages by renting the property to the
band.  See Austin Hill Country Realty, Inc., 948 S.W.2d at 299.  Because
there was no evidence of the precise amount of rent paid by the band, the trial
court did not err in finding that the McAlisters failed to meet their burden. 
We overrule their thirteenth issue.

Conclusion

Having
sustained the McAlisters’ tenth and twelfth issues, and having overruled their
other eleven issues, we modify the trial court’s judgment to reduce the damage
award by the $3,500 security deposit and to remove the award of attorney’s
fees.  We affirm the judgment as modified.

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
GARDNER,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  February 23,
2012









[1]See Tex. R. App. P. 47.4.





[2]The parties agreed to a
reduced rent for three months at the beginning of the lease so that the total
amount of rent to be paid over five years was $204,750.





[3]The total amount of rent
the McAlisters paid from May 2008 to January 2009 was $26,250.





[4]The McAlisters did not assign error to the summary
judgment on their defense of failure to mitigate.





[5]Section 11.01(A) of the
lease, on the other hand, provides for a default based on a failure to pay rent
when the failure continues for five days after Hatbreeze delivers notice of the
failure.